**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

STEVE W. BROOKS,                )
     Plaintiff,               )
                              )
     v.                       )     CAUSE NO.:  2:04-CV-237-PRC
                              )
JO ANNE B. BARNHART,            )
Commissioner of the Social Security   )
Administration,                )
     Defendant.               )

**OPINION AND ORDER**

This matter is before the Court on a Complaint [DE 1], filed by the Plaintiff, Steve Brooks,

on June 18, 2004, and a Motion for Summary Judgment or Remand [DE 9], filed by the Plaintiff on

November 15, 2004.  The Plaintiff seeks judicial review of a final decision of the Defendant, the

Commissioner of the Social Security Administration, in which the Plaintiff was denied Disability

Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under Titles II and

XVI of the Social Security Act.  For the following reasons, the Court denies the Plaintiff's request

to reverse and remand the decision of the Commissioner.

**PROCEDURAL HISTORY**

On April 8, 1998, the Plaintiff applied for Disability Insurance Benefits and Supplemental

Security Income payments.  The Plaintiff's claims for benefits were denied through the hearing

level.  On June 14, 2001, the Appeals Council granted the Plaintiff's request for review and

remanded the matter for a new hearing and decision.  On April 28, 2000, while the Appeals Council

review of the first decision was pending, the Plaintiff filed additional applications for DIB and SSI

benefits, alleging the onset of disability on December 14, 1999.  The subsequent applications were

denied on initial review and again on reconsideration, and the Plaintiff requested that these claims

be heard before an Administrative Law Judge ("ALJ").

A second hearing was held on November 29, 2001, in Merrillville, Indiana before an ALJ,

at which both the remanded decision and the subsequent applications were considered.  The ALJ

denied the Plaintiff's claim for disability benefits in a decision dated January 31, 2002.  The decision

included the following findings:

(1)    The claimant meets the nondisability requirements for a period of disability
       and Disability Insurance Benefits set forth in Section 216(i) of the Social
       Security Act and is insured for benefits through June 1, 2000.

(2)    The claimant has not engaged in substantial gainful activity since the alleged
       onset of disability.

(3)    The claimant's chronic obstructive pulmonary disease, and asthma is a severe
       impairment, based upon the requirements in the Regulations (20 CFR §§
       404.1521 and 416.921).

(4)    This medically determinable impairment does not meet or medically equal
       one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

(5)    The undersigned finds the claimant's allegations regarding his limitations are
       not totally credible for the reasons set forth in the body of the decision.

(6)    The undersigned has carefully considered all of the medical opinions in the
       record regarding the severity of the claimant's impairment (20 CFR §§
       404.1527 and 416.927).

(7)    The claimant has the following residual functional capacity: he can perform
       light exertional activities.  He should avoid polluted environments.

(8)    The claimant is unable to perform any of his past relevant work (20 CFR §§
       404.1565 and 416.965).

(9)    The claimant is a "younger individual between the ages of 45 and 49" (20
       CFR §§ 404.1563 and 416.963).

(10)   The claimant has a "limited education." (20 CFR §§ 404.1564 and 416.964).

2

(11)    The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

(12)    The claimant has the residual functional capacity to perform a significant range of light work (20 CFR § 416.967).

(13)    Although the claimant's exertional limitations do not allow him to perform the full range of light work, using Medical-Vocational Rule 202.17 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform.  Examples of such jobs include work as a cashier (9,000 jobs), sorter (6,200 jobs) and an information clerk (2,600 jobs).

(14)    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR §§ 404.1520(f) and 416.920(f)).

R. at 17.   The ALJ concluded that the Plaintiff is not disabled within the meaning of the Social Security Act because he retains the residual functional capacity to perform a reduced range of exertionally light work.

The Plaintiff timely requested review of the ALJ's decision to the Appeals Council on April 12, 2004.  By letter dated April 21, 2004, the Appeals Council declined to review the Plaintiff's claim.  As a result, the ALJ's decision of January 31, 2002, became the final decision of the Commissioner.

The Plaintiff filed his Complaint in this Court on June 18, 2004, seeking review of the final decision pursuant to 42 U.S.C. § 405(g) and alleging that the Commissioner's denial of benefits was not in accordance with the purpose and intent of the Social Security Act nor in accordance with the evidence.  On September 10, 2004, the Commissioner filed an Answer and the Administrative Record.  On November 15, 2004, the Plaintiff filed a Motion for Summary Judgment or Remand, opposing the Commissioner's decision.  The Commissioner filed a Memorandum in Support of

Commissioner's Decision on January 31, 2005, contending that the ALJ's findings were supported by substantial evidence. The Plaintiff did not file a Reply Brief.

Both parties have consented to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Thus, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## FACTS

The Plaintiff was born on April 3, 1954, and was forty-five years old at the time he became disabled on December 14, 1999, and was forty-seven years old at the time of the ALJ's decision. The Plaintiff completed the tenth grade and worked as a laborer for a tree service. He is living with his mother and receiving food stamps. The Plaintiff states that he has been unable to work since 1999 because of breathing difficulty stemming from asthma, bronchitis, and emphysema.

### A.  Medical Evidence

On April 13, 1998, Dr. Elizabeth A. Przeniczny ordered a chest x-ray, complete blood count, lipid profile, blood urea nitrogen (BUN) test, creatinine test, and other blood tests. The tests were performed at St. Anthony Medical Center in Crown Point, Indiana. The chest x-ray was normal.

On April 24, 1998, the Plaintiff had a syncopal episode while driving a car, and he crashed into a tree. In the emergency room, the Plaintiff stated that he had had some beer earlier that day and had not eaten any food. The Plaintiff reported that he had a history of chronic bronchitis, asthma, and probable early chronic obstructive pulmonary disease ("COPD"). He further reported that he had episodes of shortness of breath and coughing that leave him rather dyspneic and that he

4

had difficulty breathing.  However, he did state that he was "normally active, independent and ha[d] no difficulty with his ambulation."  R. at 98.  He also stated that he smoked "quite heavily on a daily basis."  The examination findings consisted of a "hacky, moist, nonproductive cough" and expiratory wheezes scattered throughout the lungs.  R. at 98.  Dr. Przeniczny diagnosed syncopal episode with underlying chronic bronchitis, asthma, early COPD, and hypertension.  Chest x-rays were normal and no treatment was given.

On April 30, 1998, Dr. Przeniczny completed a form for food stamps and temporary assistance on behalf of the Plaintiff.  On the form, Dr. Przeniczny stated that the Plaintiff had shortness of breath on exertion, used inhalers frequently with limited effect, and needed to adjust his medication.  Dr. Przeniczny wrote that the Plaintiff's activities were "limited at this time due to recurrent dyspnea on exertion" and checked the box next to the option indicating that the Plaintiff was "totally unable to work."  R. at 256.

On May 23, 1998, the Plaintiff returned to the emergency room as the result of another car accident due to a syncopal episode.  Earlier in the day, the Plaintiff had not eaten and had had five beers.  The Plaintiff reported a history of recent bronchitis and mild asthma.  He indicated that he was in his relatively normal state of health prior to the accident and that he did not know what happened to cause him to lose consciousness.  He reported that he had had some cough and sharp stabbing pleuritic chest pain on the left side for a week or two prior to the hospitalization.  A 24-hour Holter monitor was normal and revealed a sinus rhythm without unusual heartbeats.  A resting electrocardiogram showed sinus tachycardia but was otherwise normal.  The CT scan of the chest was unremarkable, but the impression from a plain x-ray was probable mild vascular congestion.  The diagnosis was syncope.  The Plaintiff received nebulizer treatments while hospitalized.  The

Plaintiff was released from the hospital on May 25, 1998, and was prescribed cough medicine, high blood pressure medication, and an antibiotic.

On June 16, 1998, Dr. Przeniczny completed a state agency form regarding the functional limitations stemming from the Plaintiff's impairments.  Based on her treatment over the preceding three months, Dr. Przeniczny stated that the Plaintiff had COPD and moderate asthma that caused shortness of breath on exertion and "sometimes" at rest with expiratory wheezing.  The Plaintiff reported that he experienced asthma attacks "daily" and that they are of "moderate" severity.  Dr. Przeniczny found that his asthma was "controlled" but that exacerbations were expected and that his COPD was controlled but was expected to progressively deteriorate.  Dr. Przeniczny opined that the Plaintiff could carry out normal activities but that he had limited abilities to walk, climb, and be exposed to machinery, dust, fumes, and gases.  Dr. Przeniczny observed that the Plaintiff had shown a willingness to be compliant with his prescribed medication regiment and that she had given him samples of the medications, which he was taking as directed.  However, Dr. Przeniczny noted that the Plaintiff could not afford some of the medications he should be taking.

On July 8, 1998, the Plaintiff presented at the emergency room after calling an ambulance because of difficulty breathing.  He presented with moderate respiratory distress with severe anxiety due to the difficulty of breathing.  On admission, his pulse oximetry was 89%, with persistent wheezing.  A pulmonary test showed a "dry, hacking cough throughout" the test and was interpreted as consistent with "moderate obstructive lung disease without a significant post bronchodilator response."  R. at 113-14.  An x-ray was normal, showing no focal consolidation or effusion.  It was noted that the Plaintiff smoked two packs of cigarettes a day.  The Plaintiff was discharged three

days later on July 11, 1998, with a Ventolin inhaler and a daily dose of Prednisone, from which he was to be weaned gradually.  The Plaintiff was advised to quit smoking.

On November 12, 1998, the Plaintiff returned to the emergency room with shortness of breath and a hacking cough that he had had for three days, which were unresponsive to his inhaler. The Plaintiff's blood pressure was elevated at 170/110, oxygen saturation was 94%, and he was observed to be "coughing constantly, breathing very shallowly, pretty short of breath."  R. at 119. The exam revealed scattered wheezes and a chest x-ray was consistent with COPD.  The Plaintiff was given intravenous steroids, antibiotics, and an inhaler.  The Plaintiff was admitted for "23 hour observation."  R. at 119, 311.  On November 19, 1998, Dr. Przeniczny wrote a note addressed "To Whom It May Concern" stating that the Plaintiff had been diagnosed with COPD, asthma, and hypertension with frequent exacerbations "that interfere with normal functioning."  R. at 319.

In another note "To Whom It May Concern," dated August 17, 1999, Dr. Przeniczny confirmed that the Plaintiff has hypertension, chronic bronchitis/asthma, and emphysema for which he was taking medications and was compliant.  Dr. Przeniczny further indicated that the Plaintiff "is to avoid pollution and extremes of temperature" and "has done well with recommendations to quit smoking."  R. 327.

On May 20, 2000, the Plaintiff presented to St. Anthony's, at which time an x-ray of his right shoulder revealed mild to moderate degenerative joint disease of the right acromioclavicular joint.

On August 29, 2000, a pulmonary function spirometry ("PFS") revealed an FEV1 of 1.51 liters before bronchodilation and 1.48 after bronchodilation.  The test revealed 38% of the predicted lung volumes, both before and after administration of bronchodilators.  Two months later, on

October 30, 2000, a repeat PFS showed an FEV1 of 2.05 liters before bronchodilation and 2.53 liters after bronchodilation.

On March 15, 2001, Dr. Przeniczny completed a Pulmonary Impairment Questionnaire prepared by the Plaintiff's attorney. She confirmed her treatment of the Plaintiff since April 1998 for asthma, COPD, and persistent pulmonary infections, which are "prone to exacerbations." She estimated that the Plaintiff has asthma attacks every three to four months and that they each last three to five days. She found that the Plaintiff can sit up to four hours a day; stand/walk up to one hour a day; and lift or carry up to five pounds. She expected that the Plaintiff's symptoms would "frequently" interfere with his attention and concentration and that he would need to take unscheduled rest breaks three to four times a day for 15 to 30 minutes. She estimated that he would likely miss work more than three times a month because of his symptoms or treatment. Dr. Przeniczny opined that the Plaintiff needed to avoid wetness, humidity, temperature extremes, fumes, dust, gases, odors, perfumes, solvents, cleaners, chemicals, and cigarette smoke.

On July 31, 2001, the Plaintiff presented to Dr. Przeniczny's office with a several-day history of cold symptoms with some respiratory distress. The Plaintiff was having difficulty breathing on minimal exertion with some chest discomfort. Dr. Przeniczny noted that the Plaintiff continued to smoke one pack of cigarettes a day and was normally ambulatory and normally mobile. An examination showed mild respiratory distress, as well as rhonchi and expiratory wheezes bilaterally. Dr. Przeniczny suspected pneumonia and acute bronchitis with an exacerbation of his chronic obstructive pulmonary disease and asthma. A CT scan of the chest was normal. She recommended he go to the hospital for intravenous antibiotics, fluids, and steroids, as well as nebulizer treatments. During a follow up on August 13, 2001, Dr. Przeniczny reported that the Plaintiff was "much better"

8

with no wheezes or rhonchi.  R. at 413.  Dr. Przeniczny directed the Plaintiff to finish his antibiotics, taper down the Prednisone, and quit smoking.


### B. SSA Consultative Physicians

*1.  Dr. Siddiqui*

On September 8, 1998, the Plaintiff saw Dr. Mohammed Siddiqui, an endocrinologist, at the request of the Administration.  The Plaintiff told Dr. Siddiqui that he had "intermittent episodes" of shortness of breath that were sometimes accompanied by cough.  R. at 301.  He also reported that his shortness of breath was precipitated by exertion and humid or cold weather.  The examination revealed mild respiratory distress on minimal exertion, blood pressure of 142/196, diminished breath sounds bilaterally throughout the lungs, and slight hyper-resonance to percussion over both lungs. However, he had no wheezing, rhonchi, or rales, had a normal gait, and got on and off the exam table without difficulty.  A PFS showed an FEV1 of 2.33 liters before bronchodilation and 2.43 liters after bronchodilation, consistent with a "mild" restrictive defect.  Dr. Siddiqui diagnosed shortness of breath, "possibly due to COPD," with a history of asthma and high blood pressure.  R. at 303. Dr. Siddiqui did not assess the Plaintiff's residual functional capacity.


*2.  Dr. Mahawar*

On February 23, 1999, the Plaintiff underwent an examination at the request of the Disability Determination Bureau.  The Plaintiff told Dr. Mahawar that, "when he walk[ed] slow, his SOB [shortness of breath] is okay, but with any exertion his SOB gets worse."  R. at 320.  The Plaintiff further noted that his shortness of breath became "worse with fast walking and better with rest and

medicine and t[ook] about 15 seconds to relieve it." R. at 320.  The physical examination by Dr. Suresh Mahawar revealed "a lot" of coughing throughout the exam and elevated blood pressure at 144/100.  However, the Plaintiff's lungs were clear with no wheezing or rales.  The Plaintiff had no difficulty with heel/toe walking, tandem walking, squatting, getting on and off the exam table, or hopping.  Spirometry testing revealed "moderate restriction" partially relieved to the level of "mild restriction" after administration of bronchodilators.  Dr. Mahawar diagnosed asthma–stable; COPD; cough–most likely due to bronchitis; and hypertension.  Dr. Mahawar did not evaluate the Plaintiff's residual functional capacity.

*3.  Dr. Yaniz*

On August 2, 2000, the Plaintiff was evaluated by Dr. Adolph Yaniz, a family practitioner, at the request of the Disability Determination Bureau.  The Plaintiff complained of asthma with severe shortness of breath and with chest pains during the attacks.  He stated that his asthma was aggravated by dust, fumes, aerosols, walking, hot humid weather, and extreme weather changes.  An examination revealed elevated blood pressure at 147/84, but the Plaintiff was not presently in any distress.  His lungs were bilaterally symmetrical with slight decreased breath sounds at the bases, but there was no wheezing, rales, or rhonchi.  The Plaintiff had a normal gait and was able to squat and stoop, heel and toe walk, and get on and off the exam table without difficulty.  No signs of dyspnea or fatigue were found.  Dr. Yaniz diagnosed a history of bronchial asthma and emphysema but rendered no opinion as to how these conditions might impact his ability to function.

*4. Residual Functional Capacity Assessment*

On November 16, 2000, the Plaintiff's residual functional capacity in light of his COPD was evaluated by Dr. Gaddy, a non-examining review physician with the state agency. The doctor found that the Plaintiff should avoid only concentrated exposure to temperature extremes and certain environmental irritants but that he was otherwise not functionally limited. He opined that the Plaintiff did not have any exertional, postural, manipulative, visual, or communicative restrictions but needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and extreme cold and heat. In June 2001, Dr. Landwehr reviewed the record and agreed with Dr. Gaddy's opinion.

**C.  Testimony of the Plaintiff**

On December 8, 1998, the Plaintiff filled out the Reconsideration Disability Report. He wrote: "If I do too much I can't breathe. I don't run – if I walk slow I'm ok, but if I hurry, I cough." R. at 238. He also wrote that his doctor told him to "take it easy" and to avoid over exerting himself.

During the November 17, 1999 hearing, the Plaintiff testified that he sometimes coughed so hard he passed out. He said this happened twice during the past year, and that it usually occurred when he had a cold or the flu. He testified that he had asthma attacks at night that woke him up, but he did not have any asthma attacks during the day because he "use[d] [his] inhaler like the doctor told [him] to." R. at 540. He explained that, if he was just sitting down, he would not have an asthma attack. He said the inhaler made him feel better, and he estimated that it would take thirty minutes for him to return to work if he had an asthma attack at work. He admitted that he could perform a job that required him to sit at a table for six to eight hours a day. He stated that he became

winded if he engaged in certain activities.  However, the Plaintiff testified that he vacuumed, did the dishes, and drove a car.  He stated that he could walk slowly across a mall, be on his feet for thirty minutes at a time, stand, sit, and lift ten pounds.

During the November 29, 2001 hearing, the Plaintiff testified that he had severe asthma attacks on a bi-weekly basis and minor attacks two to three times a day.  He testified that his attacks were either minor or severe, with no "in-between."  He testified that the severe attacks resulted in hospitalization and that the minor attacks caused fatigue.  He stated that he had not been hospitalized recently because he could not afford it.  The Plaintiff testified that his attacks were precipitated by fumes, dust, and smoke and explained that he had stopped smoking six months earlier.  He also noted that walking caused shortness of breath.  The Plaintiff stated that he would become short of breath if he walked normally but that he could walk to his car if he walked slowly.  He could stand and sit for thirty minutes each at a time, and he could lift only five pounds.  However, he did state that he could lift a gallon of milk.  The Plaintiff testified that he used an inhaler and took blood pressure pills but did not use steroids or a breathing machine, unless admitted to the hospital.  The Plaintiff testified that he could not perform a sedentary job because his back hurt, but he admitted that he had not sought any treatment for his back.  He did say that he took "a Tylenol here and there" for arthritis.

### D.  Testimony of Vocational Expert

Edward Pagella testified as a vocational expert ("VE") at the November 29, 2001 hearing. The VE testified that the Plaintiff's past job as a tree service laborer was not exertionally sedentary or light and agreed with the ALJ that the past job involved "dust and fumes and so forth."  R. at 564.

12

Giving "full credibility to the claimant's testimony," the VE testified that the Plaintiff could not perform any of his past jobs or any substantial gainful activity because the lifting ability to which he testified–a gallon of milk–would not meet the lifting demands of even sedentary work.[1] *Id.* Next, the ALJ asked the VE to assume a 48-year-old individual capable of performing light work but who must avoid more than moderate levels of fumes, dust, and other airborne pollutants. The VE testified that the individual could perform 55% of the occupational base for light, unskilled work, eliminating only the manufacturing jobs. The VE further testified that three positions that exist in significant numbers in the local economy that would accommodate those limitations are 9,000 cashier jobs, 6,200 sorter jobs, and 2,600 information clerk jobs. Sedentary jobs responsive to the same hypothetical include 4,000 cashier jobs, 1,800 chart account clerk jobs, and 1,200 loss prevention clerk jobs. The VE testified that someone able to sit for only four hours a day or stand/walk for only one hour a day could perform no substantial gainful activity.

## E.  The ALJ's Decision

The ALJ applied the standard five-step analysis. At step one, he found that the Plaintiff had not engaged in substantial gainful activity since the alleged onset of disability. At step two, he concluded that the Plaintiff had a severe impairment based on a pulmonary function study performed in 1998 that reveals obstructive lung disease, which significantly affects his ability to perform work functions. At step three, the ALJ determined that the Plaintiff does not have an impairment or a combination of impairments listed as disabling in the Social Security Regulations because there is no objective evidence that meets the requirements of a Listing and because no physician of record

---

[1] The VE testified that a gallon of milk weights 8.74 pounds and that sedentary work requires an individual to lift up to 10 pounds on an occasional basis.

13

has indicated that the Plaintiff's impairment meets or equals any Listing.  At step four, the ALJ found that the Plaintiff's RFC for light work in a clean environment precludes him from performing his past relevant work.  However, at step five, the ALJ found that the Social Security Administration had met its burden of demonstrating that other jobs exist in significant numbers in the national economy that the Plaintiff can perform.

### F.  Appeals Council Evidence

The Plaintiff submitted documents to the Appeals Council.  With the exception of one page (R. at 476), the documents submitted were duplicates of exhibits already contained in the record and considered by the ALJ.

### STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence.  42 U.S.C. § 405(g).  Thus, a court reviewing the findings of an ALJ will only reverse if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard.  *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment

for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869; *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ's findings are supported by substantial evidence and under the correct legal standard. *See Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir.2003); *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). If an error of law is committed by the Commissioner, then the "court must reverse the decision regardless of the volume of evidence supporting the factual findings." *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir.1997).

## DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e), (f) & 416.920(e), (f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits.   20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  The Seventh Circuit has summarized the sequence as follows:

> (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the [Commissioner]; (4) whether the claimant can perform [his] past relevant work; and (5) whether the claimant is capable of performing work in the national economy.  Under the five-part sequential evaluation process, "[a]n affirmative answer leads either to the next step, or, on Step 3 and 5, to a finding that the claimant is disabled.  A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled."  If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.

*Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001) (citations omitted) (alterations in original); *see also* 20 C.F.R. §§ 404.1520(a)(4)(i)-(iv) & 416.920(a)(4)(i)-(iv); *Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).  At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's RFC.  "The RFC is an assessment of what work-related activities the claimant can perform despite [his] limitations."  *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  The ALJ must assess the RFC based on all the relevant evidence of record.  *Id.* at 1001 (citing 20 C.F.R. § 404.1545(a)(1)).  The claimant bears the burden of proving steps one through four, *see Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995), whereas the burden at step five is on the ALJ, *see Zurawski*, 245 F.3d at 886.

An ALJ must articulate, at a minimum, his analysis of the evidence in order to allow the reviewing court to trace the path of his reasoning and to be assured that the ALJ considered the important evidence.  *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  The ALJ is not required to address "every piece of evidence or testimony in the record, [but] the ALJ's analysis

16

must provide some glimpse into the reasoning behind [the] decision to deny benefits." *Zurawski*, 245 F.3d at 888.  The ALJ must build an "accurate and logical bridge from the evidence to his conclusion so that, as a reviewing court, we may assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review."  *Young*, 362 F.3d at 995 (quoting *Scott v. Barnhart*, 297 F.3d at 595); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (citing *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## ANALYSIS

The Plaintiff argues (1) that the ALJ erred in finding that the Plaintiff's asthma has not met or equaled the criteria of a Listing and (2) that the ALJ improperly discounted the opinion of the Plaintiff's principal treating physician.  In response, the Commissioner contends that the Plaintiff's asthma does not meet Section 3.03B of the Listing of Impairments and that the ALJ's decision is supported by substantial evidence.  Again, the Court notes that the Plaintiff did not file a reply brief to respond to the Commissioner's Brief.  The Court will address each argument in turn.

### A.  Section 3.03B of the Listing of Impairments

At step three of the analysis, the ALJ considered whether the Plaintiff's chronic obstructive pulmonary disease meets or equals the criteria of Listing 3.02A, determined that it did not, and found that the Plaintiff was not disabled.  However, the ALJ did not evaluate the Plaintiff's asthma attacks under Listing 3.03B.  The Plaintiff argues that, if the ALJ had done the proper analysis, the ALJ would have found that the Plaintiff's asthma at least met the Listing criteria for the year 1998.

"To meet or equal a listed impairment, the claimant must satisfy all of the criteria of the listed impairment.  The claimant bears the burden of proving his condition meets or equals a listed impairment."  *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999) (internal citations omitted); *see also Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004).  Listing 3.03B, which pertains to asthma attacks, provides that, in order to satisfy the criteria for disabling asthma attacks, an individual must have attacks "(as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year."  20 C.F.R. Pt. 404, Subpt. P., App. 1, § 3.03B (2004).  The Listing goes on to explain that "[e]ach in-patient hospitalization for longer than 24 hours *for control of asthma* counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks."  *Id*. (emphasis added).  Listing 3.00C defines "attacks" as "prolonged symptomatic episodes" that "last one or more days" and require "intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilation therapy in a hospital, emergency room or equivalent setting."  20 C.F.R. Pt. 404, Subpt P, App. 1, § 3.00C (2004).

The Plaintiff argues that, in 1998, he presented to the emergency department at St. Anthony Medical Center on four occasions–April 13, May 23, July 8, and November 12–for treatment of his asthma and that three of those four visits were for longer than twenty-four hours.  However, a review of the record demonstrates that the Plaintiff's hospital visits in 1998 do not meet the criteria of the Listing.  The Plaintiff was only hospitalized two times in 1998 for the "control of asthma"–in July and November 1998.  The Plaintiff's hospitalization in July 1998 lasted for several days and included treatment with intravenous steroids.  Accordingly, the July hospitalization counts as two

18

attacks.  In contrast, the November 1998 hospitalization was for "23 hour observation" and counts only as one attack.  Therefore, the Plaintiff suffered three "attacks" within the meaning of Listing 3.03B, based on the July and November 1998 hospitalizations.

The Plaintiff also lists the hospitalizations on April 13, 1998, and May 23, 1998,[2] as being related to "attacks" for the purposes of Listing 3.03B.  On April 13, 1998, Dr. Przeniczny ordered a chest x-ray, complete blood count, lipid profile, blood urea nitrogen (BUN) test, creatinine test, and other blood tests, and the Plaintiff had the tests performed at St. Anthony Medical Center.  The records for this time frame do not indicate that the Plaintiff received any treatment.  Therefore, the outpatient testing on April 13, 1998, cannot constitute an asthma "attack" under the Listing.

In addition, the Plaintiff was involved in a car accident on May 13, 1998, for which he was hospitalized.  At the hospital, the Plaintiff reported that he had an episode of syncope while driving but indicated that his health was "relatively normal" that day and that he did not know why he passed out.  R. 100.  During his treatment at the hospital, the Plaintiff received some nebulizer treatments but was admitted to the hospital for cardiac testing.  The records do not indicate that he was being treated for control of his asthma.  On his Determination of Disability Social Summary form, the Plaintiff also described the reason for this hospitalization as "passed out, cat scans, heart monitor, etc."  R. at 330.  Finally, the diagnoses were syncope and collapse.  Therefore, the hospitalization on May 13, 1998, was not for treatment of an "attack" under the Listing.  However, even if the Court were to determine that this hospitalization was for an attack, and it would have counted as two "attacks" under the listing because it continued for more than twenty-four hours, the Plaintiff still would have only had five "attacks" in a twelve-month period under the Listing.

---

[2] Although the Plaintiff references a May 23, 1998, visit, there is no record of a hospitalization on that date. However, there were hospitalizations on April 24, 1998, and May 13, 1998, both of which the Court will discuss.

19

Finally, the Plaintiff was hospitalized for a car accident on April 24, 1998, as well.  Again, the Plaintiff had a syncopal episode while driving a car, and he crashed into a tree.  In the emergency room, the Plaintiff reported that he had a history of chronic bronchitis, asthma, and COPD.  He also indicated that he had episodes of shortness of breath and coughing that leave him dyspneic and that he had difficulty breathing.  After examination, Dr. Przeniczny diagnosed syncopal episode with underlying chronic bronchitis, asthma, early COPD, and hypertension.  However, no treatment was given.  Therefore, this hospitalization does not constitute an "attack" under the Listing.

Accordingly, the Court finds that, although the ALJ should have articulated his findings under Listing 3.03B in addition to Listing 3.02A, the Plaintiff does not meet the requirements of Listing 3.03B.  Remand on this issue is not appropriate.

## B.  Weight Given to Treating Physician Opinions

The Plaintiff next argues that the ALJ improperly discounted the opinion of the Plaintiff's principal treating physician, Dr. Przeniczny.  The Commissioner responds that the ALJ's finding that the Plaintiff retained the RFC to perform exertionally light work that did not require exposure to polluted environments was supported by substantial evidence.  The Court finds that the ALJ did not improperly discount the opinion of Dr. Przeniczny.

A treating physician's opinion is entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record.  *See* 20 C.F.R. § 404.1527(d)(2); *Boiles*, 395 F.3d at 426 (citing *Clifford*, 227 F.3d at 870); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).  "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel*, 345

F.3d at 470 (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(d)(2)).  However, an ALJ is entitled to discount the medical opinion of a treating physician if inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability." *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) (citing *Dixon*, 270 F.3d at 1178; *Clifford*, 227 F.3d at 871) (quoting *Clifford*, 227 F.3d at 870) (internal quotation marks omitted).  The ALJ must discuss, at some level, how the evidence of record contradicts the treating physician's diagnosis.  *See Gudgel*, 345 F.3d at 470.

In support of his argument that the ALJ did not give the proper weight to his treating physician's opinion, the Plaintiff reasons that Dr. Przeniczny's two functional capacity opinions are the only opinions of record by an examining source regarding the Plaintiff's functional capacity and that not one of the three consultative examiners ever rendered an opinion as to the functional impact of the Plaintiff's respiratory impairments.  The Plaintiff generally argues that, because Dr. Przeniczny treated the Plaintiff for over four years and because she has provided the only functionality opinions from a doctor who has examined the Plaintiff, Dr. Przeniczny's opinions constitute valuable evidence of the status of the Plaintiff's disability.  Specifically, the Plaintiff questions particular instances in which the ALJ gives little or no weight to Dr. Przeniczny's opinion and argues that the ALJ committed errors of law in doing so.  The Court will address each of the Plaintiff's concerns in turn.

*1. Dr. Przeniczny's November 19, 1998 Report*

First, the ALJ discredited Dr. Przeniczny's November 19, 1998 report, which found that the frequent exacerbations of the Plaintiff's emphysema and asthma symptoms interfered with normal functioning, by citing other evidence the ALJ believed demonstrated that the asthma did not interfere with normal functioning.   In his decision, the ALJ responded to Dr. Przeniczny's finding by reasoning:

> This is a simple statement, but the record shows on[ly] four emergency room visits for shortness of breath in 1998.  The evidence shows that he has had no other medical treatment during this time period except for a non-steroidal inhaler.  During the emergency room visits, he is treated with steroids and a breathing machine.  Four visits a year is not necessarily considered frequent, and it is also noted that despite these visits no doctor saw a reason to prescribe stronger medicine or a breathing machine for the claimant.  Additionally, while the doctors of record, who treated or examined the claimant found him to have no difficulty moving around during the exams none of them mentioned the claimant having any shortness of breath doing so.

R. at 25.

The Court notes that the Plaintiff did not even present to the hospital on the four occasions for shortness of breath as the ALJ indicated in the findings and as proposed in the Plaintiff's brief. Rather, the Plaintiff presented to the hospital five times in 1998, but only two were related to his breathing difficulties.  The first visit was for the purposes of outpatient tests, and the second and third visits were related to losses of consciousness that resulted in car accidents.  As set forth in Part A above, only the fourth and fifth visits to the hospital were specifically for treatment of asthma or COPD.  In addition, the Plaintiff was admitted to the hospital only one additional time after 1998 due to asthma or COPD, which was in 2001.  Moreover, Dr. Przeniczny's records reflect few office visits, with only three visits total–June 1998, and July and August 2001.

The Plaintiff also disputes the ALJ's citation to the failure of the Plaintiff's doctors to have prescribed stronger medication than an inhaler or to prescribe a breathing machine as a valid basis to discredit Dr. Przeniczny's opinion.  The Plaintiff reasons that it was not the lack of severity of the

22

Plaintiff's condition but rather that it was his financial inability to afford the medications that prevented doctors from prescribing stronger treatment. First, the Plaintiff cites his hearing testimony in which he states that he did not have the financial means to go to the hospital more frequently. However, his testimony does not speak to his financial ability to pay for medications. The Plaintiff also cites Dr. Przeniczny's comment in the state form she filled out on June 17, 1998, that the Plaintiff "is given samples of Cardura or antibiotics from the office and does take them as directed–but he can't afford some other meds he should be on." R. at 391. This is the only place in Dr. Przeniczny's treatment records that she references the need for additional medications; however, she does not list which medications she believes he should be taking. Notably, none of the other examining physicians indicated that the Plaintiff needed to be prescribed stronger medications nor did those physicians note that they did not prescribe medications they felt were necessary because the Plaintiff could not afford them. It was not unreasonable for the ALJ to remark that the Plaintiff had not been prescribed stronger medication or a breathing machine, and the record does not support the Plaintiff's suggestion that the only reason no doctor prescribed stronger medication or a breathing machine was his financial status. Nor does the fact that the Plaintiff received stronger treatments during hospitalization for breathing difficulties contradict the ALJ's suggestion that the severity of the Plaintiff's condition warranted less aggressive treatments; it is logical that the Plaintiff would receive stronger treatments in an emergency room setting in response to a serious asthma attack.

The Plaintiff further argues that the ALJ impermissibly played doctor when the ALJ discredited Dr. Przeniczny's November 19, 1998 opinion by noting that no treating or examining physician had found any shortness of breath secondary to the Plaintiff "moving around during the exams." R. at 25. As noted by the Plaintiff, Dr. Siddiqui did find that the Plaintiff was in mild respiratory distress on minimal exertion during an examination on September 8, 1998, and Dr.

23

Przeniczny noted some dyspnea with mild exertion during the Plaintiff's hospitalization from July 31, 2001, to August 3, 2001, for possible pneumonia.

In contrast, on February 23, 1999, Dr. Mahawar performed a consultative examination and found that the Plaintiff had no difficulty getting on/off the exam table, tandem walking, walking on heels, toes, squatting, or hopping and did not mention that the Plaintiff was under any respiratory distress or experienced shortness of breath during the examination.   In August 2000, after a consultative examination, Dr. Yaniz specifically noted that there were no signs of dyspnea or fatigue throughout the exam.  Although the ALJ appears mistaken in stating that *none* of the examining or treating physicians mentioned shortness of breath secondary to moving around during the exam because Dr. Siddiqui did find mild respiratory distress on minimal exertion, none of the subsequent examining physicians noted shortness of breath and Dr. Przeniczny's findings in July 2001 were during a hospitalization for pneumonia.

Generally, the ALJ was correct in noting the absence of comments by the various examining physicians regarding the Plaintiff's shortness of breath on examination and the error was harmless. This is not an instance of an ALJ impermissibly "playing doctor" by failing to address relevant evidence or by drawing medical conclusions from the record without relying on the medical evidence.  *See, e.g., Dixon*, 270 F.3d at 1177 (citing *Clifford*, 227 F.3d at 870; *Green*, 51 F.3d at 101-02; *Hayes v. Railroad Ret. Bd.*, 966 F.2d 298, 303 (7th Cir. 1992)).  Rather, the ALJ specifically reviewed the reports of Dr. Siddiqui, Dr. Mahawar, Dr. Przeniczny, and Dr. Yaniz in his decision and was commenting, based on the reports of those physicians, on the absence of certain evidence from the record that would tend to support the more severe condition claimed by the Plaintiff.  *See, e.g.*, *Back v. Barnhart*, 63 Fed. Appx. 254, 259, No. 02-3486, 2003 WL 1878956 at *5 (7th Cir. Apr. 11, 2003).  Moreover, this observation is only one of a variety of bases for the ALJ's determination that Dr. Przeniczny's November 19, 1998 statement regarding the Plaintiff's limitations was a

"simple statement." *See, e.g., Schmidt v. Sullivan*, 914 F.2d 117, 118 (7th Cir. 1990), cert. denied, 502 U.S. 901 (1991).

Finally, as argued by the Commissioner, Dr. Przeniczny's statement that the Plaintiff's asthma and COPD interfered with normal functioning does not constitute a medical "opinion" within the meaning of the regulations because the statement did not identify the severity of the Plaintiff's impairment and his abilities and/or restrictions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."); SSR 96-2p (providing that a medical opinion is an opinion on the issue of the nature and severity of an individual's impairment).

Based on the foregoing, the Court finds that the ALJ did not err in giving little weight to Dr. Przeniczny's November 19, 1998 statement that the Plaintiff's asthma interfered with his normal functioning and in characterizing Dr. Przeniczny's comment as a "simple statement." In addressing this statement of Dr. Przeniczny's, the ALJ adequately considered and weighed the other medical evidence of record as well as the Plaintiff's testimony.

### 2. *Dr. Przeniczny's March 2001 Functionality Assessment*

Next, the Plaintiff questions the weight the ALJ gave to Dr. Przeniczny's March 2001 functionality assessment by arguing that the ALJ either misrepresented the evidence or drew medical conclusions from the evidence without support. In the March 2001 report, Dr. Przeniczny found that the Plaintiff could lift and carry up to five pounds, sit for four hours, and stand/walk for one hour. Dr. Przeniczny also found that the Plaintiff would be absent from work three to four times a month due to exacerbations. In his decision, the ALJ discredited or rejected this functionality assessment

and found instead that the Plaintiff had an RFC for light exertional activities with a restriction to avoid polluted environments. Having reviewed the ALJ's decision and the medical and non-medical evidence of record, the Court finds that the ALJ's RFC finding is supported by substantial evidence.

In arriving at the RFC, the ALJ referenced numerous parts of the record, including treating and examining physicians, the Plaintiff's statements to the physicians, and the Plaintiff's hearing testimony. First, the ALJ reviewed the Plaintiff's treatment history, finding no treatment in 1997, four hospital visits for dyspnea in 1998 (of which only two were actually for dyspnea), and no emergency room visits for dyspnea in 1999, 2000, or 2001. Based on this treatment record, the ALJ discredited the Plaintiff's argument that he would be frequently absent from work. The Plaintiff argues that this characterization is patently false because the Plaintiff presented to the emergency room for respiratory distress on two occasions in 2000 and three occasions in 2001. A review of the record demonstrates that the ALJ's depiction of the treatment record was accurate. The Plaintiff did not go to the emergency room in 1999. In 2000, the Plaintiff had pulmonary function tests performed on an outpatient basis at the hospital. However, nothing in the record demonstrates that he presented to the emergency room for treatment in 2000. In 2001, the Plaintiff was hospitalized on one occasion with a diagnosis of "suspect pneumonia, acute bronchitis with exacerbation of chronic obstructive pulmonary disease and asthma," but he did not present to the emergency room. R. at 160. Notably, the ALJ did recognize this 2001 hospitalization for pneumonia in his decision prior to the observation that there were no emergency room visits in 1999, 2000, and 2001, and, therefore, did not fail to take into account that hospitalization. R. at 26. The Plaintiff's criticism of the ALJ's characterization of the Plaintiff's emergency room treatment in 1999, 2000, and 2001 is unfounded.

In his RFC finding, the ALJ went on to consider the examinations by Dr. Mahawar and Dr. Siddiqui, noting their minimal findings, specifically that Dr. Mahawar found the examination

unremarkable–finding asthma and COPD by history only, and that Dr. Siddiqui's spirometry revealed some restrictive lung abnormality. The ALJ then recognized that multiple PFS testing revealed only mild to moderate restrictive lung disease and that the Plaintiff had told all of the examiners that his inhaler improved his shortness of breath within a couple of minutes.  The ALJ further noted that the record demonstrated that the Plaintiff's only medication was Albuterol at home and that Albuterol is not a steroid.  Although the ALJ observed that the physical examinations of record showed clear lungs, no rales, rhonchi, or wheezing, the ALJ did recognize that there is objective evidence that the Plaintiff has COPD with asthma.  Finally, the ALJ found that all of the doctors of record, including Dr. Przeniczny, had continually found the Plaintiff's COPD and asthma to be stable.

The Plaintiff argues that the ALJ mischaracterized the findings of Dr. Siddiqui and Dr. Mahawar as "unimpressive" when in fact those examinations "yielded objective evidence of lung dysfunction corroborative of Dr. Przeniczny's findings."  Pl. Br. at 13.  However, the ALJ specifically noted that the objective evidence of record lent support to the Plaintiff's claim of asthma and COPD.  The Plaintiff's pulmonary function tests generally showed only "mild" or "moderate" asthma/COPD.  *See* R. at 114, 273, 277, 305, 324.  Even during an acute asthma exacerbation in July 1998, the pulmonary function tests showed only a "moderate" impairment.  *See* R. at 114, 273, 277. Therefore, the ALJ accurately quoted the findings of the pulmonary function study reports and accurately characterized the severity of the Plaintiff's lung impairment.  Moreover, Dr. Mahawar's findings of coughing during the examination–"most likely due to bronchitis," R. at 322–and a moderate restriction on the spirometry exam along with Dr. Siddiqui's findings of diminished breath sounds bilaterally, restrictive lung abnormalities on pulmonary function testing, and mild respiratory distress on minimal exertion do not undermine the ALJ's characterization of the reports from Dr.

Siddiqui and Dr. Mahawar. The ALJ recognized the objective findings that support asthma and COPD, the suspected diagnoses of both doctors.

More importantly, the Plaintiff's statements were consistent with the reviewing physicians' opinions and the ALJ's RFC determination. First, regarding ambulation, the Plaintiff either stated on reports or testified that he could walk slowly and across a mall and that he had no difficulty if he walked slowly. The Plaintiff also explained that he had difficulties breathing when he tried to hurry. Although light work may require substantial walking, it does not specifically require that the walking be performed at a hurried pace. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b).[3] In addition, the Plaintiff reported during various examinations that he was normally active, ambulatory, mobile, and had no difficulty with ambulation. The Plaintiff stated that he could be on his feet for thirty minutes at a time. Regarding ambulation, the Plaintiff's own statements support the ALJ's finding.

Regarding the timing and severity of his asthma attacks, the Plaintiff testified that his asthma attacks occurred at night but that they never occurred during the day or while sitting. He also testified that if he did develop an asthma-related difficulty, it would improve within fifteen seconds with the use of his inhaler. Furthermore, the Plaintiff testified that, even if he did have an asthma-related difficulty, he could still perform a sedentary job despite feeling fatigued for thirty minutes

---

[3] Pursuant to the regulations, light work is defined as follows:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b). Sedentary work is defined as follows:

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. §§ 404.1567(a), 416.967(a).

after the episode.  Again, the Plaintiff's own testimony regarding the severity of his attacks supports the ALJ's findings.

In further support of his RFC determination, the ALJ found that Dr. Przeniczny's opinion was inconsistent with other evidence of record.  As noted by the ALJ, Dr. Przeniczny's opinion was inconsistent with the Plaintiff's testimony that he could lift ten pounds and a gallon of milk.  In addition, Dr. Przeniczny's opinion within the March 15, 2001 report was internally inconsistent by first finding that the Plaintiff had asthma attacks once every three to four months but then later opining that the Plaintiff would miss work more than three times a month due to his condition.  As discussed by the ALJ and noted above, Dr. Przeniczny's opinion was inconsistent with the objective findings that the Plaintiff's asthma/COPD was "mild" or "moderate," even during acute exacerbations that required hospitalization.  Dr. Przeniczny's opinion as to the severity of the Plaintiff's condition is inconsistent with the lack of hospitalizations as a result of asthma/COPD and the lack of regular medical treatment for the condition, as previously discussed.  Finally, on August 17, 1999, Dr. Przeniczny opined that the Plaintiff needed only to avoid pollution and extremes of temperature, yet in March 2001, Dr. Przeniczny added the limitations on walking and standing.  However, neither Dr. Przeniczny's records nor the objective medical evidence of record set forth a basis for the change in opinion.  *See Griffith v. Callahan*, 138 F.3d 1150, 1155 (7th Cir. 1998) (rejecting a treating physician's opinion because a later opinion contradicted an earlier opinion and was not supported by "objective findings of deterioration") (citing *Knight*, 55 F.3d at 313-14; *Edwards v. Sullivan*, 985 F.2d 334, 337 (7th Cir.1993)), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561 (7th Cir. 2003).

In his determination, the ALJ also gave less weight to Dr. Przeniczny's opinion on the Plaintiff's physical abilities and stamina, in part, because it appeared it was based on the Plaintiff's own subjective statements and because Dr. Przeniczny had "never done a functional capacity test

to see what he really could do."  R. at 27.  The Plaintiff reasons that the absence of a test is immaterial because Dr. Przeniczny had been treating the Plaintiff for over an almost four-year period and because Dr. Przeniczny's opinion was based on "innumerable spirometry tests, chest x-rays, and personal observations over eight hospitalizations."  Pl. Br. at 13 (no citations to the record).  A medical expert's report is not entitled to controlling weight when it is based solely on a complainant's own subjective complaints.  *See Carradine v. Barnhart,* 360 F.3d 751, 777 (7th Cir. 2004) (citing *Butera*, 173 F.3d at 1057) (doctor's opinion not entitled to controlling weight where physician "did not obtain any evidence beyond . . . [patient's] subjective complaints . . . .")); *see also Rice*, 384 F.3d at 371 ("And medical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints.") (citing *Farrell v. Sullivan*, 878 F.2d 985, 989 (7th Cir. 1989)); *Dixon*, 270 F.3d at 1178 (citing *Diaz*, 55 F.3d at 308).  In this case, Dr. Przeniczny did have objective tests to consider in addition to the Plaintiff's statements.  However, as set forth above, the objective tests do not support the severity of limitation found by Dr. Przeniczny.

In making his RFC determination, the ALJ relied, in part, on the opinion of Dr. Gaddy, a reviewing physician, who opined that the Plaintiff did not have any exertional, postural, manipulative, visual, or communicative restrictions, but that the Plaintiff needed to avoid concentrated exposure to fumes, odors, dust, gases, poor ventilation, and extreme cold and heat.  Dr. Landwehr reviewed Dr. Gaddy's report and concurred.  "An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."  *Gudgel*, 345 F.3d at 470 (citing *Moore v. Barnhart*, 278 F.3d 920, 924 (9th Cir. 2002)), *cited in Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 1994).  In this matter, the ALJ agreed with the reviewing physician's determination only after having reviewed all of the medical and non-medical evidence set forth

above.  In addition, the ALJ recognized in his decision that the reviewing physicians did not have all the current evidence at the time of their determinations.  The ALJ's decision to reject or give less weight to Dr. Przeniczny's opinion was not based solely on the opinions of Dr. Gaddy and Dr. Landwehr.  Notably, these findings are consistent with Dr. Przeniczny's opinion that the Plaintiff needs to avoid pollution and temperature extremes, and the doctors came to the same conclusion as Dr. Przeniczny did in June 1998.

Lastly, the Plaintiff faults the ALJ for not providing at least some weight to Dr. Przeniczny's opinion based on the factors provided in 20 C.F.R. § 404.1527(d)(2)-(6).  The factors consist of (1) the length of treatment; (2) the nature and extent of the treatment relationship; (3) the supportability of the medical opinion; (4) the consistency of the opinion with the record as a whole; (5) the physician's degree of specialization; and (6) other factors which tend to support or contradict the opinion.  *See* 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).  Although the ALJ does not specifically reference these factors, the Court finds, based on its foregoing analysis, that the ALJ's decision demonstrates that he considered the factors set forth in the regulations in establishing the weight given to Dr. Przeniczny's opinions.

Finally, the Plaintiff does not object to the ALJ's determination at step five that, based on the VE's testimony, an individual with the RFC of light work with exposure to no more than moderate levels of fumes, dust, and airborne pollutants could perform fifty-five percent of the light occupational base and seventy-five percent of the sedentary occupational base.

### 3.  Dr. Przeniczny's Other Opinions of Record

Although the Plaintiff contests the ALJ's analysis of Dr. Przeniczny's November 19, 1998 and March 2001 opinions, the Plaintiff does not address Dr. Przeniczny's other opinions of record.

However, a brief review demonstrates that these opinions either support or have no bearing on the ALJ's RFC finding.

On April 30, 1998, Dr. Przeniczny opined in a "Statement of Medical Condition for the Food Stamp and Temporary Assistance for Needy Families Program," that the Plaintiff was "[t]otally unable to work" and that the Plaintiff's activities were limited at that time due to recurrent dyspnea on exertion. R. at 256. First, based on the evidence of record, it appears that Dr. Przeniczny made this opinion at a time when the Plaintiff had not yet been hospitalized for dyspnea but only for a car accident resulting from a loss of consciousness and for which he had received no treatment. Therefore, it appears that this opinion is conclusory. In addition, a claimant is not entitled to disability benefits solely on the statement of his physician that he is "disabled" or unable to work. *Dixon*, 270 F.3d at 1177 (citing *Clifford*, 227 F.3d at 870). Rather, it is the ALJ, not the doctor selected by the Plaintiff to treat him, who is vested with the ultimate authority to decide whether the Plaintiff is "disabled" within the meaning of the Act. *Id*. (citing *Clifford*, 227 F.3d at 870; 20 C.F.R. § 404.1527(e)(1)); *see also* §§ 404.1527(e)(1), 416.927(e)(1); SSR 96-5p; *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004) (holding that "a medical opinion on an ultimate issue such as whether the claimant is disabled is not entitled to controlling weight, the ALJ must consider the opinion"); *Johansen v. Barnhart*, 314 F.3d 283, 287-88 (7th Cir. 2002); *Dixon*, 270 F.3d at 1177.[4]

Second, on the June 17, 1998 disability report, Dr. Przeniczny opined that the Plaintiff could carry out normal activities with limited ability to walk, climb, and be exposed to dust, fumes or gases due to dyspnea. Dr. Przeniczny indicated that as to walking and climbing, the symptoms

---

[4] In *Dixon*, the Seventh Circuit recognizes the "biases that a treating physician may bring to the disability evaluation." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Court reasoned:

> The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability. Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise.

*Id*.

would be relieved with rest and use of an inhaler, whereas the Plaintiff should not be exposed to dust, fumes, or gases.  This opinion is generally consistent with the ALJ's RFC determination. Because Dr. Przeniczny did not indicate to what extent the Plaintiff was limited in walking, it is not clear whether that aspect of her opinion is inconsistent with the ALJ's findings.  However, as set forth above, the ALJ's findings regarding walking are not inconsistent with the Plaintiff's own testimony or the findings of the other physicians.

Finally, Dr. Przeniczny opined in a general letter on August 17, 1999, that the Plaintiff should avoid pollution and temperature extremes.  Again, Dr. Przeniczny's restriction on avoiding polluted environments is consistent with the ALJ's RFC determination.  Although the ALJ did not address a restriction on avoiding extremes of temperature, the Plaintiff has not suggested how his finding of limited light work with no exposure to pollutants is inconsistent with that restriction.  The light and sedentary jobs identified by the VE all appear to be jobs performed indoors (cashier, sorter, information clerk, chart account clerk, and loss prevention clerk), presumably in temperature controlled environments, and the Plaintiff has not suggested otherwise.

## CONCLUSION

For the foregoing reasons, the Court finds that the ALJ's determination at step five of the sequential disability analysis was supported by substantial evidence.  Therefore, the Court **DENIES** the Motion for Summary Judgment or Remand [DE 9].  The Court **REAFFIRMS** the ALJ's decision in all respects.

SO ORDERED this 29th day of June, 2005.

s/ Paul R. Cherry
MAGISTRATE JUDGE CHERRY
UNITED STATES DISTRICT COURT

33

cc:     All counsel of record